*Appeal No. 21-11521-G*

_____

*In the*
United States Court of Appeals
*For the*
Eleventh Circuit

_____

OJ COMMERCE LLC, and
NAOMI HOME, INC.,
*Plaintiffs-Appellants*
vs.
KIDKRAFT, INC., and
MID-OCEAN PARTNERS IV, L.P.,
*Defendants-Appellees*

_____

On Appeal from the United States District Court
for the Southern District of Florida
Hon. Marcia G. Cooke
Case No. 19-60341-Civ-COOKE/SNOW

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

Velvel (Devin) Freedman
Constantine Economides
ROCHE FREEDMAN LLP
P.O. Box 654139
Miami, Florida 33265

Shlomo Y. Hecht
SHLOMO Y. HECHT, PA
3076 N. Commerce Pkwy
Pembroke Pines, FL 33025

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, Appellants OJC, LLC and Naomi Home, Inc. hereby make its disclosure of interested persons and corporate disclosure statement:

Cooke, Marcia G., District Court Judge

KidKraft Group Holdings, LLC

KidKraft, Inc.

KidKraft Intermediate Holdings, L.L.C.

MidOcean Partners IV, L.P.

Naomi Home, Inc.

OJ Commerce, LLC

Roche Freedman LLP

Gibson Dunn and Crutcher, LLP

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This case involves important questions of antitrust law that the District Court decided on summary judgment, and oral argument may assist the Court in its evaluation of the record evidence and the pertinent legal principles.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT                                          ii

STATEMENT REGARDING ORAL ARGUMENT                            iii

TABLE OF CITATIONS                                            vi

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION                                                  1

STATEMENT OF THE ISSUES                                       2

STATEMENT OF THE CASE                                         4

   I.   Introduction                                 4

   II.  Facts Alleged and Supported by Record Evidence   7

   III. Proceedings Below                             16

STANDARD OF REVIEW                                            20

SUMMARY OF ARGUMENT                                           21

ARGUMENT                                                      24

   I.   Plaintiffs presented ample evidence of both actual and potential harm
to competition                                                24

    A.   Harm to competition means actual or potential harm to consumer welfare, and it includes increased prices, reduced output, or reduced product choice ..................................................................................25

    B.   OJC presented ample evidence of actual or potential competitive harm ..................................................................................28

    C.   Naomi Home also provided ample evidence of actual or potential competitive harm .........................................................................35

    II.   OJC has presented ample evidence of an actionable *Aspen Skiing* refusal to deal claim           41

    III.   The "Legitimate Business Reasons" defense is for the jury     47

    IV.   The Tortious Interference Claim Should Be Reinstated     51

    CONCLUSION     54

    Certificate of Compliance     56

    Certificate of Service     56

# TABLE OF CITATIONS

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*
  342 F. Supp. 3d 126 (D.D.C. 2018)....................................................27

*Altitude Sports & Ent., LLC v. Comcast Corp.*
  2020 WL 8255520 (D. Colo. Nov. 25, 2020) ............................44, 47

*Am. Ad Mgmt., Inc. v. GTE Corp.*
  92 F.3d 781 (9th Cir. 1996)..............................................................30

*Apex Hosiery Co. v. Leader*
  310 U.S. 469 (1940)..........................................................................25

*\*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*
  472 U.S. 585 (1985).................................................................passim

*Bailey v. Metro Ambulance Servs., Inc.*
  992 F.3d 1265 (11th Cir. 2021) .......................................................20

*Bechtel Constr. Co. v. Sec'y of Labor*
  50 F.3d 926 (11th Cir.1995).............................................................48

*Blue Shield of Virginia v. McCready*
  457 U.S. 465, 482–83 (1982) ..........................................................26

*Burger King Corp. v. Ashland Equities, Inc.*
  161 F. Supp.2d 1331 (S.D. Fla. 2001) .............................................53

*\*Byars v. Bluff City News Co.*
  609 F.2d 843 (6th Cir. 1979) ....................................................31, 37

*Chase Mfg., Inc. v. Johns Manville Corp.*
  2020 WL 1433504 (D. Colo. Mar. 23, 2020).....................................27

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*
  370 U.S. 690 (1962)..........................................................................29

*Copperweld Corp. v. Independence Tube Corp.*
  467 U.S. 752 (1984)...............................................................2, 16, 17

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*
   797 F.3d 1248 (11th Cir. 2015) ............................................................34, 40, 51

*Eastman Kodak Co. v. Image Technical Services, Inc.*
   504 U.S. 451 (1992)………………………………………………………….51

*Entrata, Inc. v. Yardi Sys., Inc.*
   2019 WL 4597519 (D. Utah Aug. 14, 2019) ...........................................43, 47

*Feminist Women's Health Ctr., Inc. v. Mohammad*
   586 F.2d 530 (5th Cir. 1978) .........................................................................51

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*
   830 F.3d 1242 (11th Cir. 2016) .....................................................................21

*Frappied v. Affinity Gaming Black Hawk, LLC*
   966 F.3d 1038 (10th Cir. 2020) .....................................................................48

*FTC v. Advoc. Health Care*
   2017 WL 1022015 (N.D. Ill. Mar. 16, 2017).................................................30

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*
   466 F.3d 961 (11th Cir. 2006) .................................................................22, 36

*Helicopter Transp. Servs., Inc. v. Erickson Air–Crane Inc.*
   2008 WL 151833 (D. Or. Jan. 14, 2008) ......................................................44

*\*Impax Lab'ys, Inc. v. Fed. Trade Comm'n*
   994 F.3d 484 (5th Cir. 2021) ...................................................................25, 31

*In re Domestic Drywall Antitrust Litig.*
   2018 WL 2184391 (E.D. Pa. May 10, 2018) .................................................29

*In re Thalomid & Revlimid Antitrust Litig.*
   2015 WL 9589217 (D.N.J. Oct. 29, 2015)....................................................44

*Iris Wireless LLC v. Syniverse Techs.*
   49 F. Supp. 3d 1022 (M.D. Fla. 2014)...........................................................44

*Jacobs v. N.C. Admin. Off. of the Cts.*
   780 F.3d 562 (4th Cir. 2015) .........................................................................49

*Jacobs v. Tempur-Pedic Int'l, Inc.*
626 F.3d 1327 (11th Cir. 2010) .................................................................passim

*Johnson Enters, of Jacksonville, Inc. v. FPL Grp., Inc.*
162 F.3d 1290 (11th Cir. 1998) ....................................................................52

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*
359 U.S. 207 (1959) ....................................................................................17

*KMS Rest. Corp. v. Wendy's Int'l, Inc.*
361 F.3d 1321 (11th Cir. 2004) ....................................................................53

*Law Offs. of David J. Stern, P.A. v. SCOR Reinsurance Corp.*
354 F. Supp. 2d 1338 (S.D. Fla. 2005) .........................................................52

*Levine v. Cent. Fla. Med. Affiliates, Inc.*
72 F.3d 1538 (11th Cir. 1996) ......................................................................24

*Lorain Journal Co. v. United States*
342 U.S. 143 (1951) ........................................................... 7, 22, 37, 44, 45

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*
302 F.3d 1207 (11th Cir. 2002) ....................................................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ....................................................................................21

*McWane, Inc. v. FTC*
783 F.3d 814 (11th Cir. 2015) ................................................................24, 25

*Mize v. Jefferson City Bd. of Educ.*
93 F.3d 739 (11th Cir. 1996) ........................................................................20

*Moore v. GEICO Gen. Ins. Co.*
633 Fed.Appx. 924 (11th Cir. 2016) ..............................................................20

*NCAA v. Bd. of Regents*
468 U.S. 85 (1984) ..........................................................................21, 25, 28

*Novell, Inc. v. Microsoft Corp.*
731 F.3d 1064 (10th Cir. 2013) ...................................................19, 44, 46, 56

*Omni Healthcare Inc. v. Health First, Inc.*
  2016 WL 4272164 (M.D. Fla. Aug. 13, 2016) ...................................................51

*Otter Tail Power Co. v. United States*
  410 U.S. 366 (1973) ...............................................................................37, 61

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*
  268 F. Supp. 3d 1071 (C.D. Cal. 2017) ...........................................................44

*Pepsico, Inc. v. Coca-Cola Co.*
  1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ....................................................44

*Plain Bay Sales, LLC v. Gallaher*
  2020 WL 5750499 (S.D. Fla. Sept. 25, 2020)....................................................53

*Poller v. CBS*
  386 U.S. 464 (1962) ....................................................................................51

*Procaps S.A. v. Patheon, Inc.*
  845 F.3d 1072 (11th Cir. 2016) ...........................................................28, 32, 33

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*
  917 F.3d 1249 (11th Cir. 2019) ......................................................................24

*Realcomp II, Ltd. v. FTC*
  635 F.3d 815 (6th Cir. 2011) .........................................................................32

*Reeves v. Sanderson Plumbing Prods., Inc.*
  530 U.S. 133 (2000).....................................................................................20

*Reiter v. Sonotone Corp.*
  442 U.S. 330 (1979)......................................................................................25

*Spanish Broad. Sys. v. Clear Channel Commc'ns, Inc.*
  376 F.3d 1065 (11th Cir. 2004) ............................................................34, 40, 47

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*
  311 F. Supp. 3d 468 (D.R.I. 2018) .................................................................44

*Strickland v. Norfolk S. Ry. Co.*
  692 F.3d 1151 (11th Cir. 2012)................................................................20, 41

*T.V. Azteca S.A. de C.V. v. Telemundo Commc'ns Grp., Inc.
  2007 WL 9701166 (S.D. Fla. Feb. 21, 2007)........................................26, 52, 53

Thompson v. Allstate Ins. Co.
  476 F.2d 746 (5th Cir. 1973).......................................................23, 52

TSI Prod., Inc. v. Armor All/STP Prod. Co.
  2019 WL 4600310 (D. Conn. Sept. 23, 2019)..................................27

United States v. Dentsply Int'l, Inc.
  399 F.3d 181 (3d Cir. 2005)........................................................26

United States v. Falstaff Brewing Corp.
  410 U.S. 526 (1973)....................................................................25

US Airways, Inc. v. Sabre Holdings Corp.
  105 F. Supp. 3d 265 (S.D.N.Y. 2015).............................................30

*Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP
  540 US 398 (2004)...............................................................passim

*Viamedia, Inc. v. Comcast Corp.
  951 F.3d 429 (7th Cir. 2020).................................................passim

Weiss v. JPMorgan Chase & Co.
  332 F. App'x 659 (2d Cir. 2009)..................................................49

Wilk v. Am. Med. Ass'n
  895 F.2d 352 (7th Cir. 1990)............................................22, 26, 31

## Statutes

15 U.S.C. § 1, 2, 15..............................................................1, 7, 8

28 U.S.C. § 1291.......................................................................1

28 U.S.C. § 1331.......................................................................1

28 U.S.C. § 1337.......................................................................1

28 U.S.C. § 1367.......................................................................1

**Other Authorities**

3B P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust
   Principles and Their Application ¶ 772e. (4th ed. updated 2021) ..............passim

R. Bork, The Antitrust Paradox 66 (1978).............................................................25

RESTATEMENT (SECOND) OF TORTS § 769 cmt. d (1979) .........................53

Roger D. Blair & Jeffrey L. Harrison, *Rethinking Antitrust Injury*
   42 Vand. L. Rev. 1539, 1542 (1989) .................................................26

*The Economics of Competitive Injury*
   45 Brandeis L.J. 345 (2007) ........................................................25, 26

*Wealth Transfers As the Original and Primary Concern of Antitrust*
   50 Hastings L.J. 871 (1999) ............................................................27

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because the case raises federal antitrust claims under 15 U.S.C. §§ 1, 2 and 15. DE 1 at 2, ¶¶ 6-7. The district court had supplemental jurisdiction over the state law claims because they form part of the same case or controversy. 28 U.S.C. § 1367.

The basis for this Court's appellate jurisdiction is 28 U.S.C. § 1291, as Appellants seek review of a final order of summary judgment by the district court, issued March 31, 2021. DE 255.

This appeal was timely filed on April 29, 2021 and is from a final order that disposes of all claims. DE 256.

# STATEMENT OF THE ISSUES

This is an antitrust action based on 1) Defendant KidKraft's termination of a longstanding, profitable relationship with Plaintiff OJ Commerce ("OJC") in retaliation for OJC's selling a competing product, 2) KidKraft's threats to cut off resellers (including OJC) if they dealt with Plaintiff Naomi Home, and 3) an agreement between Defendants KidKraft and Mid-Ocean to maintain KidKraft's monopoly and harm consumers by preventing Naomi Home from competing with KidKraft. Despite finding that Plaintiffs submitted sufficient evidence to establish the existence of genuine issues of material fact as to the relevant product market, KidKraft's monopoly market power in that market, and Defendants' ability to conspire with each other under *Copperweld*, the District Court granted summary judgment to Defendants. The issues on appeal are:

1.     Whether the District Court erred in granting summary judgment on the grounds that Plaintiffs failed to provide evidence of "competitive harm," even though Plaintiffs provided both fact and expert evidence that the challenged conduct resulted in increased prices and reduced product choices for consumers, which qualifies as harm to competition in accordance with Supreme Court and Eleventh Circuit authority, such as *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) (antitrust plaintiff may prove harm to competition by pointing to

"specific damage done to consumers in the market," such as "reduction of output, increase in price, or deterioration in quality").

2.      Whether the District Court wrongly granted summary judgment on Plaintiff OJC's refusal to deal claim on the grounds that the Supreme Court's *Aspen Skiing* decision and its progeny are inapplicable, even though Plaintiffs provided evidence that Defendant KidKraft terminated a longstanding, profitable, voluntary relationship with Plaintiff OJC, sacrificed short-term profits, and refused to sell to OJC on the same terms as other potential buyers. According to numerous other cases, including a recent Seventh Circuit decision, "no more is required" for recovery under the *Aspen Skiing* line of authority. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020).

3.      If summary judgment on the antitrust claims is reversed, whether the District Court wrongly granted summary judgment on OJC's state law tortious interference claim on the grounds that Plaintiffs failed to "allege or show" absence of justification for the interference, even though justification is an affirmative defense and Plaintiffs came forward with evidence that Mid-Ocean's interference was unjustified because it used illegal and improper means.

**STATEMENT OF THE CASE**

## I.  <u>Introduction</u>

Can a monopolist avoid antitrust liability for 1) threatening to cut off dealers that sell competing products and 2) terminating a long-term voluntary and profitable relationship with a dealer who sells a competing product, on the grounds that such actions caused no harm to competition – in the face of fact and expert evidence that these actions caused price increases and reduced output and thereby harmed consumer choices? Plaintiffs say no, and that is the primary issue on this appeal.

This is a federal antitrust and state law tortious interference action by two sister companies, OJC and Naomi Home, Inc. ("Naomi Home") (collectively "Plaintiffs") against KidKraft, Inc. ("KidKraft") and Mid-Ocean Partners IV, L.P. ("Mid-Ocean") (collectively "Defendants").  DE 1.

KidKraft is the dominant supplier of wooden play kitchens ("WPKs") in the United States; holding an over ███ market share.  DE 1 at 3, ¶ 13; DE 144, Ex. 3, at 6, 19, ¶¶ 12, 50. Mid-Ocean is a private equity fund that induced KidKraft to take the anticompetitive actions at issue in this case.  DE 1 at 2, 12-13 ¶¶ 5, 75-81.

OJC, a smaller version of Amazon or Overstock, is an online seller of furniture and other household products.  DE 1 at 1, 4. As testified to by Plaintiffs' CEO (Jacob Weiss) and Plaintiffs' expert (Dr. Vanderhart), OJC is an aggressive discounter that leverages proprietary programs to monitor the prices of other online retailers, and

4

lowers OJC's price to below its competitors.  DE 144, Ex. 1 at 6, ¶ 14; DE 144, Ex. 3 at 34, ¶ 76.  When these retailers notice OJC has beaten their price, they lower their own, which triggers OJC's programs, and the cycle starts again.  *Id.* This creates a race to the bottom over price that benefits consumers by lowering their cost.  *Id.* Naomi Home manufacturers and sells WPKs and other children's furniture which provides consumers with other options and different designs. DE 144, Ex. 1 at 2-3, ¶¶ 3-5; DE 144, Ex. 3 at 34, ¶ 77. OJC and Naomi Home each have separate and distinct antitrust claims against Defendants.  *See* DE 1.

OJC undisputedly had a long-term, voluntary, profitable relationship with KidKraft for the sale of KidKraft's WPKs and other KidKraft products on OJC's e-commerce web platform. *See, e.g.,* DE 144, Ex. 3 at 35-37, ¶¶ 80-84. In fact, OJC was one of KidKraft's ███ resellers.  *Id.* In mid-2015, Mid-Ocean acquired a majority interest in KidKraft.  DE 131, Defs_Appx Tab E, at 3, ¶ 8. Mid-Ocean's board soon learned OJC wasn't only selling KidKraft's WPK, but was also selling a competing WPK from Naomi Home.  DE 144, Ex. 1 at 4-6, ¶¶ 6-14; DE 131, Ex. 19 at 2. Because of that competition, Mid-Ocean and KidKraft agreed that KidKraft should use its monopoly power to force OJC into discontinuing sales of the Naomi Home WPKs.  *Id.* The plan worked at first in that the threat of termination caused Naomi Home to stop production of multiple competing products. But when OJC continued selling just the original Naomi Home WPK, KidKraft eventually refused

to deal with OJC and cut it off entirely. This action harmed competition and consumers as KidKraft had terminated one of its ███ resellers who was an aggressive price discounter and whose pricing practices had driven fierce price competition in online marketplaces. DE 144, Ex. 1 at 4-6, ¶¶ 6-14; DE 144, Ex. 3 at 34-35, ¶¶ 76-79. Thus, KidKraft's termination of OJC allowed the price of KidKraft WPKs to rise, and it did rise, to the detriment of consumers and competition. *Id.*

Naomi Home, in contrast, never had a direct relationship with KidKraft. Rather, it sought to compete with KidKraft by selling a lower-priced WPK and other children's products. *See, e.g.,* DE 144, Ex. 1 at 2-3, ¶¶ 3-5; DE 144, Ex. 3 at 34, ¶ 77. KidKraft did not want a competitor intruding on its monopoly, so it threatened to cut off any distributor that opted to carry Naomi Home WPKs. DE 144, Ex. 10 at 159:1-14.[1] KidKraft's threats were successful. *Id.* To allay KidKraft's concerns, and preserve OJC's business relationship with the KidKraft behemoth, Naomi Home ceased development of numerous items that would have directly competed with KidKraft thereby again depriving customers of these product choice options, and the competitive affect they'd have had on market price. *Id.*; DE 144, Ex. 3 at 34, ¶ 77 ("████████████████████████████████████████████████████ ████████████████████████████████████████").

---

[1] Deposition transcript citations are identified by the page number assigned by the court reporter, because the transcripts do not page numbers generated by the district court's filing system. *See* 11th Cir. R. 28-5.

In sum, KidKraft's conduct resulted in both (i) increased price to consumers and (ii) decreased product choice for consumers. DE 144-3 at 34-35, ¶¶ 76-79.

Thus, both OJC and Naomi Home have unique and distinct claims against KidKraft for monopolization and attempted monopolization under Sherman Act § 2, 15 U.S.C. § 2, and against both defendants for an agreement that unreasonably restrains trade under Sherman Act § 1, 15 U.S.C. § 1. OJC's claim is for anticompetitive refusal to deal under *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and its progeny, while Naomi Home's claim is for KidKraft's threats to refuse to deal with customers that do business with its rivals, as in *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), and its progeny. And both OJC and Naomi Home have a claim that, by agreeing to take these actions against Plaintiffs, KidKraft and Mid-Ocean unreasonably restrained trade, in violation of Sherman Act § 1. OJC also asserted a state law claim that Mid-Ocean tortiously interfered with its business relationship with KidKraft by inducing KidKraft to terminate its relationship with OJC.

## II.   Facts Alleged and Supported by Record Evidence

OJC is an online retailer that sells products to consumers through its website. DE 255 at 1. As testified to by Plaintiffs' CEO, OJC is an "aggressive discounter," that "

█████████████████████████████████████████████████." DE 144, Ex. 1 at 6, ¶ 14.

"███████████████████████████████████████████████████████████

█████████████████████████████." *Id*.; *See also* DE, 144, Ex.

10 at 96:10-25 ("██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████").

In sum, OJC's pricing behavior created a highly competitive environment where

ecommerce retailers engaged in a race to the bottom on price. Plaintiffs expert

confirmed OJC had built a "███████████████████████████████," and

opined that OJC's exponential growth and sales were due and owing to the fact that

it was "█████████████████████████." DE 144, Ex. 3 at 8, 34, ¶¶ 18, 76. She

therefore concluded that ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████" *Id*. at ¶ 76. Of course, this harm was even more pronounced because

OJC was not just a KidKraft retailer, but one of KidKraft's **largest** retailers –

consistently ranked as the █████████ biggest reseller out of over █████ DE 144, Ex. 3

at 32-33, ¶¶ 81-83 (████████████████████████████████████████████

███████████████████████████████████████████████); DE 144, Ex.

4 at 15 (6680) ██████████████████████████████████

██████████ ); DE 144, Ex. 5 at 5-6 (994-5) (██████ in 2016).

Naomi Home manufactures and sells WPKs. DE 144-1 at 2-3, ¶ 3. Prior to the actions at issue in this suit, Naomi Home had one WPK in circulation and began designing other products that would compete with KidKraft's catalogue, *e.g.,* other WPKs, a train table, and a dollhouse. DE 144, Ex. 3 at 34, 40-41 ¶¶ 77, 96-102 (expert report relating conversations with Plaintiffs CEO about the planned production of these items). As detailed below, sales of the Naomi Home WPK was scaled back, and completion of the remaining products halted due to KidKraft's anticompetitive actions. DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13, 270:9-23 (Weiss deposition detailing specifics of KidKraft's threat, and promises of reduced output to save relationship). After KidKraft terminated OJC, Naomi Home also started selling other furniture products. DE 255 at 1; DE 144, Ex. 1 at 1, ¶ 17 ('██

████████████████████████████████████████████

█████████████████ "). Naomi Home and OJC share a common owner. DE 255 at 1, ¶ 3.

KidKraft manufacturers and sells WPKs and other children's products. DE 255 at 1. Its WPK market share is over ████. DE 144, Ex. 3 at 18-19, 29, ¶¶ 48-50, 61 & Ex. E. Mid-Ocean is a private equity firm that, in July 2015, acquired a majority

(but not 100%) ownership interest in KidKraft. *Id*. at 1-2; DE 131, Def_Appx Tab E, ¶¶ 4-6.[2]

In 2011, OJC and KidKraft entered into an agreement under which OJC was to sell KidKraft products—including its WPKs—on its online platform and otherwise. DE 255 at 2. The agreement was voluntary and highly profitable for both parties, as OJC became one of KidKraft's ███████ resellers, ranking as high as ███████. DE 144, Ex. 3 at 35-36, ¶¶ 81-83; DE 144, Ex. 4 at 15 (6680); DE 144, Ex. 5 at 5-6 (6994-5).

OJC began selling Naomi Home's WPKs in 2013. DE 255 at 2. In 2015, KidKraft's Matan Wolfson had a conversation with Jacob Weiss about the Naomi Home WPKs. *Id*.; DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13. Wolfson was "very angry" about OJC selling a "competitive product." *Id*. Wolfson threatened that KidKraft would cut off OJC from further KidKraft products unless OJC agreed to stop selling Naomi Home products. *Id*.

On the same call, Weiss offered to ensure that his company would refrain from producing any other products that would compete with KidKraft. DE 255 at 2; DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13. It was agreed Naomi Home would cease the development and sale (via OJC or otherwise) of additional competing products

---

[2] Contrary to the statement in the District Court's opinion, KidKraft is not "family owned" since Mid-Ocean purchased a controlling share of the company in 2015.

and, in exchange, OJC would be permitted to continue reselling KidKraft products. DE 144, Ex. 3 at 34, ¶ 77; DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13, 270:9-23. In accordance with this understanding, KidKraft forced Naomi Home to reduce production of its WPKs and stop development of other new and innovative items, including a train table and a dollhouse. DE 144, Ex. 3 at 34, 40-41 ¶¶ 77, 96-102 (expert report relating conversations had with Plaintiffs CEO about the planned production of these items); DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13, 270:9-23 (Weiss deposition detailing specifics of KidKraft's threat, and promises of reduced output to save relationship). This conduct by KidKraft obviously caused injury to Plaintiffs, but it also caused harm to competition and consumers in the form of reduced choice and output because Naomi Home made less kitchens, and stopped/delayed the production of additional WPK models, train tables, and dollhouses. *Id*; DE 144, Ex. 3 at 34, ¶ 77 (consumer choice was reduced because "███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████").

In July 2015, Mid-Ocean acquired a majority interest in KidKraft. DE 131, Def_Appx Tab E, ¶¶ 4-6, At a Mid-Ocean board meeting in November 2016, the Naomi Home WPK was raised, and KidKraft's Daniel Barr was instructed to contact Jacob Weiss. DE 131, Ex. 19; DE 144, Ex. 10, 280:6 - 281:5, 281:10 - 288. Shortly thereafter, Mr. Barr sent OJC's Mr. Weiss a smoking gun email admitting that "the

topic of the Naomi Kids Brand came up" at Defendants' board meeting, that KidKraft noticed a "decline in sales" (apparently) as a result of the Naomi Home brand competition, and that KidKraft wanted a call with OJC about this issue. DE 131, Ex. 19, at 2. Barr then called Weiss and told him OJC had to either stop selling the Naomi Home kitchen altogether or lose its KidKraft business relationship completely. DE 144, Ex. 1 at 5-6, ¶¶ 12-14; DE 144, Ex. 10, 280:6 - 281:22, 283:23 - 287:10. Mr. Weiss declined, but pleaded for an opportunity to discuss the matter with KidKraft's management. *Id.* Two days later, KidKraft cut off OJC's account without notice, refusing to ship even products that customers had already paid for in full. *Id.* KidKraft refused to sell any products to OJC, even at higher prices that KidKraft was using when selling products to other retailers. DE 144, Ex. 1 at 5-7, ¶¶ 11-15

KidKraft's termination of OJC harmed both OJC and competition in general because, without the presence of this "aggressive discounter," KidKraft could and did raise its prices, as consumers were left with fewer, and more expensive, purchasing options for WPKs. DE 144, Ex. 1 at 6, ¶ 14 (Weiss testimony about aggressive discounting); DE, 144, Ex. 10, at 322:10-25 (Weiss testimony about price effects of eliminating OJC); DE 144, Ex. 3 at 34, ¶ 76 (Vanderhart report opining that removing a retailer whose model is premised on lowest price increased price to consumer and harmed competition). And KidKraft's own documents show, and the

testimony of Plaintiffs' expert Dr. Vanderhart confirms, that KidKraft's termination of OJC led to actual, and very real, price increases to the detriment of consumers. *Id.*; DE 144, Ex. 3 at 29-32, 34-35, 62, 63, 66-67, 76, ¶¶ 61-68, 76-79, Exs. C, D, G (Vanderhart report demonstrating, with citations to KidKraft documents and examining KidKraft's financials, that after OJC's termination in November 2016, the (¶ 62) " ██████████████████████████████████████████████

██████ "); DE 144, Ex. 28 at 2 (internal KidKraft email stating that " ████████████████

██████████████████████████ "); DE 131, Tab E, Ex. 4 at 9 (emphasis added) (internal KidKraft deck stating " █████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████ ").

In addition, KidKraft's own documents show KidKraft was willing to incur short-term profit losses resulting from its termination of OJC. Indeed, internal KidKraft emails show that KidKraft was unable to meet its sales targets due in substantial part to the termination of OJC. DE 144, Ex. 27 at 3 (" ███████████████

████████████████████████████████████████ " in part because " ███████████████

███████████████████████████████████ "); DE 144, Ex. 28 at 2 ██████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████ ."); DE 144, Ex. 3 at 37, ¶¶ 85-86 (Vanderhart report opining on this

evidence). Nevertheless, KidKraft refused to sell to OJC on the same terms as other buyers, or on any terms at all. DE 144, Ex. 1 at 6, ¶¶ 13 (Weiss declaration so stating).

Before and after the termination, and at all times prior to this litigation, KidKraft gave only one reason for its refusal to deal with OJC – the fact that OJC was selling the competing Naomi Home WPK. DE 144, Ex. 1 at 4-7, ¶¶ 6-12, 15 ("the sole reason communicated to me for that termination was that OJC was selling the competing NH Kitchen"); DE 144, Ex. 10, 280:6 - 281:22, 283:23 - 287:10 ("I'd been told in unequivocal terms that the Board is very unhappy with me selling the product and that I could either discontinue the product or lose – or risk losing the KidKraft line"). Although after litigation commenced KidKraft asserted other pretextual justifications, none of the after-the-fact reasons were previously mentioned or even remotely implied. *Id*. And the District Court in its order, even pointed out the flaws in these illegitimate excuses. DE 255 at 8, n1.

KidKraft claimed that the Naomi Home WPK was a "knock off" of KidKraft's WPK, but this photo, produced by KidKraft in discovery, is worth a thousand words:



DE 144, Ex. 31 at 4, KK response to interrogatory no. 1.

As the photos show, the NH kitchen is far from a knock-off of KidKraft's kitchen. DE 144, Ex. 1 at 3-4, 9-14, ¶¶ 4-5 and Ex. A; DE 144, Ex. 3 at 38-39, ¶¶ 91-93. All they have in common is that they are both contemporary-style kitchens made of wood. *Id*. Besides those very general commonalities, they are different in their layout and design. *Id*. But to Defendants, **any competing product** is a knock-off. DE 235, Ex. 23, 121:1-4 ("███████████████████████████████████

████████████████████████████████████████████████

██████████████████████████"); DE 144, Ex. 11 at 2 ("████████████

███████████████████████"); DE 144, Ex. 12 at 3 (describing yet another "████████

███████████" by a competitor); DE 144, Ex. 3 at 39, ¶ 94 (Plaintiff expert stating that

"███████████████████████████████████████████████████████████

[redacted] .").

### III. <u>**Proceedings Below**</u>

After Defendants unsuccessfully moved for Rule 12(b)(6) dismissal of Plaintiffs' complaint, both sides engaged in written and deposition discovery. Defendants moved for summary judgment prior to completion of fact and expert discovery. *Compare* DE 130 *with* DE 125. After objection, the Court permitted short supplemental briefing after completion of discovery. DE 232.

KidKraft sought summary judgment on the § 2 claims on the grounds that Plaintiffs did not have sufficient evidence to create a fact question for the jury on the issues of relevant product market, power in the relevant market, harm to competition, and illegal refusal to deal. DE 130. Both Defendants sought summary judgment on the § 1 claim on the grounds that, because Mid-Ocean has a majority interest in KidKraft, the claim is barred by the "separate entity" doctrine set forth in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984). Mid-Ocean also sought summary judgment on the state law tortious interference claim, arguing that Florida's "significant financial interest" privilege barred the claim. DE 130.

The District Court granted the motion in its entirety, albeit on vastly narrower grounds than argued by Defendants. The District Court agreed with Plaintiffs that

there is sufficient evidence to create a genuine factual issue on three issues: 1) that WPKs constitute a nationwide antitrust product market, 2) that KidKraft has monopoly power in that market, and 3) that KidKraft and Mid-Ocean are "separate entities" within the meaning of *Copperweld*. DE 255.

Nevertheless, the court granted summary judgment on all claims because Plaintiffs "have not provided evidence of competitive harm," a necessary element of a private antitrust claim. DE 255 at 6. Below, Defendants contended there was no competitive harm because "one fewer retailer out of a nationwide retail market . . . has no substantial impact on the market," DE 130 at 15, but the District Court (correctly) did not even mention this argument in her order.[3] Instead, the District Court first observed that, consistent with this Court's decision in *Jacobs, supra*, "harm to competition can be shown by through reduction of output, increase in price, or deterioration in quality, and the plaintiff claiming such harm should point to the specific damage done to consumers in the market." 255 at 6 (internal citations omitted). In a conclusion that has no explanation and makes little sense, the District Court then concluded that

---

[3] Defendants' "no substantial impact" argument lacks merit. Exclusionary conduct by a monopolist "is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy." *Klor's, Inc. v. Broadway-Hale Stores, Inc*., 359 U.S. 207, 213 (1959). More importantly, the advent of e-commerce and online marketplaces like Amazon and Walmart means that one merchant can have a very substantial impact on price through aggressive discounting, which drives prices down.

Plaintiffs have not provided evidence of competitive harm. **Sure, Plaintiffs assert that KidKraft did in fact raise the price of its wooden play kitchens** in 2017 and in 2018. However, higher prices alone are not the epitome of anticompetitive harm. Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act.

*Id*. (emphasis added). It simply unclear how the District Court reconciled this conclusion that competition wasn't harmed with Plaintiffs asserted price increase, and the evidence discussed above demonstrating it and competitive harm, *e.g.,* (i) OJC's aggressive discounting strategies, (ii) Naomi Home's forced scaling back of production, (iii) KidKraft's own documents showing they were able to increase the price of their WPK after OJC was terminated, and (iv) Dr. Vanderhart's opinion that OJC's termination resulted in increased prices to consumers, and that Naomi Home's forced scale back resulted in decreased output and less consumer choice.

Further, the District Court acknowledged Plaintiffs could have satisfied their burden without showing *actual* harm to competition, if they could just "show[ the] *potential* for genuine adverse effects on competition," as well as a defined market and KidKraft's power in that market. *Id.* at 7 (emphasis added). But in another conclusion that's difficult to understand, and which continues to ignore the evidence cited above, the District Court acknowledged that genuine issues of material fact surround the relevant market and KidKraft's power in that market, but the court concluded that "even if [the market was] adequately defined and uncontested, and

18

KidKraft's market share was sufficient to establish market power, this, by itself, would be insufficient to establish adverse effect." *Id*.

The District Court also granted summary judgment on OJC's refusal to deal claim, which is based on the Supreme Court's *Aspen Skiing* decision, on an alternative ground. Quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013), the District Court stated that *Aspen* applies only if the monopolist's conduct is "irrational but for its anticompetitive effect," which "is hardly the case here." DE 255 at 6. But the court disregarded Plaintiffs' evidence of irrational conduct, the fact that KidKraft's purported ex-post-facto "justifications" for the conduct could have easily been disbelieved by the jury (as the District Court found, *id*. at 7-8, n.1). Moreover, the court failed even to consider or mention several recent cases cited by Plaintiffs, including the Seventh Circuit's holding in *Viamedia, Inc. v. Comcast Corp.*, *supra*, 951 F.3d at 463, that "at most" the only required proof under *Aspen* is that the defendant monopolist 1) terminated a longstanding, profitable, voluntary relationship, 2) sacrificed short-term profits, and 3) refused to sell to plaintiff on the same terms as other potential buyers.

Finally, as Plaintiffs had previously conceded their state law tortious interference claim stands or falls with the antitrust claims, the District Court granted summary judgment on this claim as well, on that basis. DE 255 at 8-9. The court

alternatively found for Defendants on the grounds that Plaintiffs failed to "allege or show" the interference was unjustified. *Id*.

Plaintiffs timely appealed.

## STANDARD OF REVIEW

The District Court's order granting summary judgment is reviewed *de novo* by this Court. *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1272 (11th Cir. 2021). In doing this review, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party, *i.e.,* Plaintiffs. *Id*. "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

"It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Moore v. GEICO Gen. Ins. Co.* 633 Fed.Appx. 924, 927 (11th Cir. 2016) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)); *see also, e.g., Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…." (internal quotation marks omitted)). A summary judgment must be reversed if, on the record taken as a whole, a "rational trier of fact" could find for the non-moving

party. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## SUMMARY OF ARGUMENT

The District Court correctly found Plaintiffs had presented sufficient evidence of the relevant market and KidKraft's monopoly power in that market. But it erred by finding Plaintiffs had not provided evidence of any actual or even potential harm to competition. Harm to competition means harm to consumer welfare and includes increased prices, output reductions, diminished product choice, or any other "advantages which [consumers] derive from free competition." *NCAA v. Bd. of Regents*, 468 U.S. 85, 106–08 (1984).

But Plaintiffs came forward with ample expert and fact evidence, some from KidKraft's own files, showing the challenged conduct led to increased prices and reduced product choices all of which actually harmed, and had the real potential to harm, consumer welfare.

The fact that KidKraft raised its prices after terminating OJC is shown plainly on documents Defendants produced in discovery, and it is not disputed. Testimony from Plaintiff's CEO and expert showed that the price increase occurred because OJC's aggressive discounting forced the online market to compete with its lower

prices and by terminating OJC, KidKraft relieved that significant downward pressure on prices.

Furthermore, Plaintiffs' evidence showed that KidKraft's efforts to exclude Naomi Home from the market harmed "the competition process in general." As there is evidence from which a jury can plausibly find that KidKraft harmed competition by successfully threatening Naomi Home's actual retailers (OJC) and targeted retailers (Costco) with termination if they carried Naomi Home's competing product.

Actions like these, that exclude a rival from the market, harm competition because they "den[y] consumers the benefit of the pressure to lower prices." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967–68 (11th Cir. 2006); *see also Lorain Journal*, *supra* (monopolist's refusal to deal with customers that do business with its rivals harms competition and is illegal under § 2). KidKraft's successful effort to delay Naomi Home's manufacturing and sale of other WPK models and additional innovative products that would have competed with KidKraft's other product offerings clearly harmed competition because it deprived consumers of product choice and lessened competitive pricing pressure. *See*, *e.g.*, *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) ("interfere[nce] with the consumer's free choice to take the product of his liking" is harm to competition). Therefore, the District Court's finding of no competitive harm should be reversed.

The alternative grounds for summary judgment over OJC's § 2 refusal to deal claim also requires reversal. The court rejected Plaintiff's claim on the theory that it was not similar to the one approved by the Supreme Court in *Aspen Skiing*. However, OJC presented strong evidence, including uncontradicted evidence from KidKraft's own files, of all three required elements of an *Aspen Skiing* claim: the defendant 1) terminated a longstanding, profitable, voluntary relationship, 2) sacrificed short-term profits, and 3) refused to sell to plaintiff on the same terms as other potential buyers. As shown by the Seventh Circuit in *Viamedia*, and as recognized by numerous other federal courts, nothing more is required.

The other ground for summary judgment pertained just to OJC's tortious interference claim. The District Court found this claim failed because Plaintiffs had failed to "allege or prove" that Mid-Ocean's interference was not justified. As an initial matter, Plaintiffs did in fact allege that "[t]here was no legal justification for MidOcean's tortious actions." DE 1, ¶¶ 80, 75, 31-36. Nonetheless, justification is an affirmative defense. A **defendant** must prove justification; a plaintiff need not prove lack of justification. *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 749 (5th Cir. 1973). At any rate, Plaintiffs presented evidence from which a jury can easily find that Mid-Ocean's conduct was illegal, improper, in bad faith, and thus unjustified.

Reversal is required.

# ARGUMENT

## I. Plaintiffs presented ample evidence of both actual and potential harm to competition

The two essential elements of a Section 2 cause of action are: (1) the "possession of monopoly power" in the relevant market and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 US 398, 407 (2004); *McWane, Inc. v. FTC*, 783 F.3d 814, 828 (11th Cir. 2015).

The elements of a Section 1 claim are (1) an agreement, combination, or conspiracy that (2) unreasonably (3) restrains interstate or foreign trade. *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545 (11th Cir. 1996). The District Court found that Plaintiffs had provided sufficient evidence to create a genuine factual issue for the jury on these elements of both the Section 1 and 2 claims. Nonetheless, the District Court granted summary judgment on all of Plaintiffs' claims, holding there was no harm to competition. This holding was erroneous, because Plaintiffs presented ample expert and fact evidence, including some from KidKraft's own documents, to create a genuine issue for the jury as to whether KidKraft caused actual, or at a minimum potential, competitive harm.

**A.    Harm to competition means actual or potential harm to consumer welfare, and it includes increased prices, reduced output, or reduced product choice**

A defendant's conduct harms competition if it "ha[s] or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition." *NCAA v. Bd. of Regents*, 468 U.S. 85, 106–08 (1984) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 500–01 (1940)). This is because antitrust law is a "consumer welfare prescription." *NCAA*, quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quoting R. Bork, The Antitrust Paradox 66 (1978)). Its "principal concern is with consumer harm," and "conduct that raises customer prices lies at the core of such harm." 3B P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 772e. (4th ed. updated 2021) ("A&H").

A defendant's actions cause anticompetitive harm if they "harm the competitive process, and thereby harm consumers." *McWane*, 783 F.3d at 835. "Anticompetitive effects are those that harm consumers. Think increased prices, decreased output, or lower quality goods. **Eliminating potential competition is, by definition, anticompetitive**." *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 493 (5th Cir. 2021) (emphasis added); *see also United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 532–33 (1973) (actions to prevent "potential competitor" from entering the market "adversely affect competition"); Marshall, *The*

*Economics of Competitive Injury*, 45 Brandeis L.J. 345, 354, 384 (2007) (competitive harm includes "any market conduct or activity that impairs, threatens, suppresses or jeopardizes" any conditions of a perfectly competitive market "that may ultimately lead to the curtailment of output and higher prices"); Roger D. Blair & Jeffrey L. Harrison, *Rethinking Antitrust Injury*, 42 Vand. L. Rev. 1539, 1542 (1989) ("a plaintiff has suffered antitrust injury whenever the injury is a necessary consequence of an act that is part of a plan that would harm consumers").

The District Court correctly noted that, in light of antitrust law's focus on consumer welfare, harm to competition results from exclusionary conduct including, but not limited to, "reduction of output, increase in price, or deterioration in quality." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482–83 (1982) ("an increase in price resulting from a dampening of competitive market forces" is one type of competitive injury). Competitive harm also includes conduct that "interfere[s] with the consumer's free choice to take the product of his liking." *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (quotation omitted); *United States v. Dentsply*

*Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (limitation of choice is an anti-competitive effect).[4]

As the District Court further recognized, "consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act." DE 255 at 6 (quoting *Jacobs, supra*). "Economists have almost universally condemned the allocative inefficiency resulting from monopoly pricing," which "virtually every antitrust scholar criticizes as harmful to society." Lande, *Wealth Transfers As the Original and Primary Concern of Antitrust*, 50 Hastings L.J. 871, 878–79 (1999).

The District Court also correctly noted that an antitrust plaintiff may establish competitive harm in either of two ways – by proof of actual harm to consumers or by proof of potential harm to consumers. DE 255 at 7 (quoting *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1213 (11th Cir. 2002)); *see also Jacobs*, 626 F.3d at 1339. A plaintiff may establish anticompetitive harm on the market by showing "either (1) that the restraint had an 'actual detrimental effect' on competition, or (2) that the restraint had the potential for genuine anticompetitive

---

[4] *Accord, e.g.*, A&H ¶ 772e (restrictions on customer choice); *Chase Mfg., Inc. v. Johns Manville Corp.*, 2020 WL 1433504, at *15 (D. Colo. Mar. 23, 2020) ("limitation of customer choice of suppliers" deemed harm to competition sufficient for monopolization claim); *TSI Prod., Inc. v. Armor All/STP Prod. C*o., 2019 WL 4600310, at *14 (D. Conn. Sept. 23, 2019) ("reduced consumer choice" has adverse effect on competition); *2301 M Cinema LLC v. Silver Cinemas Acquisition Co*., 342 F. Supp. 3d 126, 137–38 (D.D.C. 2018) (same).

effects and that the conspirators had market power in the relevant market." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) (quotation omitted).

## B. OJC presented ample evidence of actual or potential competitive harm

OJC put forward credible fact and expert evidence from KidKraft's own documents that OJC's termination was quickly followed by an increase in KidKraft's WPK prices. DE 144, Ex. 28 (internal KidKraft email stating that "███ ███████████████████████████████"); DE 144, Ex. 3 at ¶¶ 61-68, 76-79, Exs. C, D, G (Vanderhart report demonstrating, with citations to KidKraft documents and examining KidKraft's financials, that after OJC's termination in November 2016, the (¶ 62) "████████████████████████████████████████████ ████"); DE 131, Tab E, Ex. 4 at 9 (emphasis added) (internal KidKraft deck stating "████████████████████████████████████████████████████").

Both OJC's CEO and Dr. Vanderhart explained exactly why this occurred. Specifically, they both explained that OJC was an aggressive discounter who grew based on offering the lowest price available online, that this tactic forced other online retailers to drop their price to compete with OJC, and that this caused a race to the bottom on price between ecommerce retailers. DE 144, Ex. 1, ¶ 14 (Weiss testimony about aggressive discounting); DE, 144, Ex. 10, at 322:10-25 (Weiss testimony about price effects of eliminating OJC); DE 144, Ex. 3 at 34, ¶ 76 (Vanderhart report opining that removing a retailer whose model is premised on lowest price increased

the price to consumers and harmed competition). Thus, when KidKraft terminated OJC (it removed that significant downward pressure on competition, which resulted in KidKraft increasing prices to the ultimate consumer (and "increased margins" for other retailers who no longer needed to compete with OJC's aggressive discounting strategies, DE 131, Tab E, Ex. 4 at 9). DE 144, Ex. 3 at 34 ¶¶ 76, 78 (opining that the termination of OJC, an aggressive discounter, "████████████████████

████████████████████████████████████████

████████████████████").[5] Moreover, KidKraft's termination of OJC's downward pressure on price was significant and not merely the termination of a minor KidKraft reseller; out of over ██████ KidKraft resellers, OJC was one of the ████, at times as high as KidKraft's ██ biggest reseller. DE 144, Ex. 3 at 32-33, ¶¶ 81-84 (Vanderheart Report citing evidence of OJC being KidKraft's ██████████████████ biggest reseller out of over ██; DE 144, Ex. 4 at 15 (6680) (identifying OJC as KidKraft's ████ biggest seller based on gross sales in 2014); DE 144, Ex. 5 at 5-6 (994-5) ██████ in 2016). Taken together, this evidence more than plausibly leads to the conclusion that KidKraft's elimination

---

[5] Plaintiffs need not prove that KidKraft's exclusionary conduct was the sole cause of the price increase; proof that it was a "substantial" or "material" factor is sufficient. *In re Domestic Drywall Antitrust Litig.*, 2018 WL 2184391, at \*2 (E.D. Pa. May 10, 2018). *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 702 (1962) (jury question whether "whether respondents' conduct materially contributed" to antitrust injury).

of this large discount driving customer adversely affected competition, and a jury could easily credit it. But the District Court erroneously foreclosed Plaintiffs' opportunity to present this evidence to the jury.

The law is in accord that this evidence is sufficient. "Because it is difficult to image a more typical example of anti-competitive effect than higher prices, the opinion of [plaintiff's] expert is sufficient to create a genuine issue of material fact regarding the issue of actual anti-competitive effect." *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996); s*ee also US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 281 (S.D.N.Y. 2015) (denying summary judgment because expert testimony "provide[d] an ample theoretical basis" for a finding of adverse effect on competition), *aff'd in part*, *rev'd in part on other grounds*, 938 F.3d 43 (2d Cir. 2019); *FTC v. Advoc. Health Care*, 2017 WL 1022015, at \*8 (N.D. Ill. Mar. 16, 2017) (granting preliminary injunction in light of expert testimony regarding potential anticompetitive effects due to a price increase).

After quoting *Jacobs* holding that harm to competition can be shown through "reduction of output, increase in price, or deterioration in quality" and that plaintiffs "should point to the specific damage done to consumers in the market," the District Court ignored the evidence cited above and instead, concluded: "Sure, Plaintiffs assert that KidKraft did in fact raise the price of its wooden play kitchens in 2017 and in 2018. However, '[h]igher prices alone are not the epitome of anticompetitive

30

harm. Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act.'" DE 255 at 6 (quoting *Jacobs*). That cursory statement was the end of the discussion. There was no real mention of the evidence cited above or an explanation of why the higher price here wasn't competitive injury.

As shown above, Plaintiffs did more than "assert" a price increase. They came forward with their CEO's testimony, expert testimony, and uncontradicted documents from KidKraft's own files which showed it was the termination of OJC which resulted in increased prices to consumers. Plaintiffs submitted highly plausible evidence of actual, concrete harm to competition – prices increased, consumers were disserved, and allocative inefficiency resulted. "[C]onduct that raises customer prices lies at the core of [competitive] harm." A&H ¶ 772e. And Plaintiffs' evidence that KidKraft acted to punish OJC for supporting Naomi Home's entry into competition in the market is additional evidence of harm to competition, since it was clearly aimed at forcing OJC to drop or lessen its Naomi Home product offerings and "[e]liminating potential competition is, by definition, anticompetitive." *Impax*, 994 F.3d at 493; *see also Byars v. Bluff City News Co.*, 609 F.2d 843, 858 (6th Cir. 1979) (punishing customer for dealing with a competitor is "inherently anti-competitive").

*Procaps*, this Court's latest decision on the anticompetitive effect of price increases, shows that reversal is required. In *Procaps*, the Court reaffirmed *Jacobs* holding that "[a]ctual anticompetitive effects include, but are not limited to, reduction of output, increase in price, **or** deterioration in quality." 845 F.3d at 1084 (emphasis added). The plaintiff sought to establish competitive harm through emails, other internal documents, and experts who relied on hypothetical predictions and "abstract inferences" rather than "any specific examples" of anticompetitive effects. *Id*. at 1085. One expert even "acknowledged that his report did not observe that prices were actually higher" and admitted that prices were not raised when the challenged conduct occurred. *Id*. The emails and internal documents said nothing about any price increase and "tell us nothing more than that the Banner assets were removed." *Id*.

Here, unlike in *Procaps*, Plaintiffs have *KidKraft internal documents* that explicitly acknowledge the post-termination price increase, and even the specific amount thereof. DE 144, Ex. 28 at 2 ("███████████████████████ ███████"); DE 131, Tab E, Ex. 4 at 9 ("██████████████████"); DE 144, Ex. 3 at 29-30, ¶¶ 62-63 ("████████████████████████████████████ ███████████████████████████████" (citing KidKraft internal document)). Dr. Vanderhart's expert opinion on price increases is based on actual market data, KidKraft financial documents, and other internal KidKraft documents. DE 144-3 at

29-32, 34-35, 62-70, 76, ¶¶ 61-68, 76-79, Exs. C, D, G (opining that "████████

████████████████████████████" (citing and analyzing KidKraft internal

documents)). She thus properly relied on "specific and concrete facts," indeed from

the monopolist itself, rather than on the "theoretical effects stated only at the highest

level of abstraction" relied on by the *Procaps* experts, 845 F.3d at 1085.  In short,

Plaintiffs have presented specific and concrete evidence that the challenged

exclusionary conduct actually caused price increases, *i.e.,* the type of evidence

missing in *Procaps*, and the judgment below should be reversed.

At the very least, if Plaintiffs' price increase evidence is somehow deemed

insufficient to show *actual* competitive harm, it is certainly enough to establish a

jury question on *potential* competitive harm. The District Court acknowledged that

this is "an alternative method of showing competitive harm" that can be established

if the defendant has market power, and it found a genuine factual issue on market

power. DE 255 at 7. The court then correctly noted that a showing of market power

is necessary but it is "by itself … insufficient to establish adverse effect." *Id*. And

that was the end of the discussion of this issue. The District Court did not state what

else, besides market power, is needed to establish potential competitive harm, why

Plaintiffs' evidence was inadequate, or why Plaintiffs should not be afforded an

opportunity to convince a jury of this issue.  *See id*.

The rule is that a plaintiff establishes potential harm to competition by showing market power "plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." *Spanish Broad. Sys. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004); *Jacobs*, 626 F.3d at 1339–40; *see also Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1270 (11th Cir. 2015) (plaintiff must show market power and "link that fact to a competitive harm"); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827 & n.6 (6th Cir. 2011) (evidence of market power and the restraint's "anticompetitive tendencies" or "anticompetitive nature" held "sufficient to show the potential for anticompetitive effects").

Under this standard, there is a genuine issue of material fact on potential harm to competition. In light of KidKraft's market power, a jury could plausibly find that the termination of the long-term, profitable relationship with an aggressive discounter who was a top-20 retailer, at the sacrifice of short-term profits and for the purpose of punishing and preventing competition, was "inherently anticompetitive" or had "anticompetitive tendencies." *Spanish Broad.*, 376 F.3d at 1073; *Realcomp II*, 635 F.3d at 827 & n.6. The termination created at least the potential for price increases (indeed, it actually increased prices), diminished competition, reduced output, reduced options for consumers, and was contrary to consumer welfare.

**C. Naomi Home also provided ample evidence of actual or potential competitive harm**

KidKraft took two distinct actions to stop Naomi Home's market entry that also caused harm to competition.

First, from 2015 through November 2016, KidKraft threatened to cut off OJC unless Naomi Home stopped producing any additional products that competed with KidKraft. DE, 1-1 (smoking gun email from KidKraft to Weiss that initiated KidKraft's refusal to deal, stating that Naomi Home competition was raised at a board meeting, along with the decline in sales the competition caused, and that KidKraft wanted to "talk with" Weiss about it); DE 144, Ex. 1 ¶¶ 6-15 (Weiss declaration detailing KidKraft's threats); DE 144, Ex. 10, 168:12 – 169:7 (Weiss deposition testimony about first instance of KidKraft's threats), 279:21 – 281:19 (Weiss deposition testimony on second instance of KidKraft's threats), 284:1 – 285:22 (continued deposition testimony on same); DE 144-29 (internal KidKraft email chain noting the Naomi Home kitchen was back in stock and KidKraft's Executive Vice President of Sales responding that "███████████████████ ██████"); DE 235, Ex. 14, 101:1 – 102:23 (KidKraft executive testifying █████ ████████████████████████████████████████████████ ██████), 103:13-25 (executive testifying ████████████████████ ██████████████████), 108:17-21 (same), 110:7-14 (same).

Second, after the November 2016 termination, KidKraft threatened to take action against third party sellers such as Costco if they sold the Naomi Home WPK. DE 144, Ex. 18 at 2, ¶¶ 1-7 (testimony that retailers wouldn't carry the Naomi Home WPK because "they did not want to carry a product that would directly compete with Kidkraft and thereby upset the applecart"); DE 144, Ex. 10 164:14-25, 175:19-23, 180:10-12, 184:14-185:15, 189:16-24, 195:11-21, 196-14-20 (Weiss testifying KidKraft sent a "very clear message in the market" that anyone who sold Naomi Home would lose KidKraft items); Ex. 18, 186:5 – 188:17 (Drobnis testimony he understood Costco rejected Naomi Home's products because "people don't want to upset the KidKraft settlement on the mountain," "that no one wanted to carry Naomi Home because they were concerned about their relationship with KidKraft," that the response he received from Costco was "highly unusual," and he was "very surprised" to receive it). Both exclusionary actions caused actual and potential harm to competition.

The District Court found that "the harm described here is harm to competitors—not harm to the competition process in general, as required by law." DE 255 at 6. That holding is incorrect. An action to exclude a rival from the market obviously harms competition because it "denies consumers the benefit of the pressure to lower prices." *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 967–68 (11th Cir. 2006). If "a monopolist refuses to deal with customers

who deal with its rivals," such "behavior is inherently anti-competitive [and] illegal, either as monopolization or attempt to monopolize." *Byars v. Bluff City News Co.*, *supra*, 609 F.2d at 858. As shown in the previous paragraphs, Plaintiffs have submitted extensive evidence that shows KidKraft engaged in that precise anti-competitive conduct to suppress Naomi Home's competing products (both via actions against OJC and Costco).

The Supreme Court has confirmed that a monopolist faces liability if it refuses to deal with a customer that does business with its rivals. *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951). In *Lorain*, a newspaper refused to accept ads from customers unless they agreed not to place ads with the local radio station. The Supreme Court unanimously held that the newspaper had violated § 2 because its threats were made "as a purposeful means of monopolizing interstate commerce." *Id*. at 155; *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973) (monopoly power company violated § 2 by refusing to sell wholesale power to towns that wished to start competing power companies); 2A A&H ¶ 391e ("If an incumbent monopolist takes steps to maintain its monopoly by foreclosing a would-be rival from entering, … [consumers are] injured because they do not get the benefit of the competition that would have accompanied entry [and] it perpetuates monopoly pricing"); *id*. ¶ 768e3 ("A supplier's requirement that a customer not deal with a particular rival seems particularly hard to justify") (citing *Lorain Journal*).

KidKraft, a monopolist, threatening OJC, Naomi Home's retailer, with termination to force it to stop carrying Naomi Home products, was anticompetitive and it caused harm to competition. Even before KidKraft terminated OJC in November 2016, KidKraft harmed competition by forcing OJC to agree not to carry any Naomi Home products other than the one WPK and to carry less of that one WPK. DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13, 270:9-23 (Weiss testifying about OJC agreeing not to develop other Naomi Home products and to "not even try to sell any Naomi Home products to any retailers for approximately two years" due to KidKraft's threats); DE 144, Ex. 3 at 34, ¶ 77 ("███████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ██████"); DE 144, Ex. 29 (internal KidKraft email chain noting the Naomi Home kitchen was back in stock and KidKraft's Executive Vice President of Sales responding that "████████████████████████"); DE 235, Ex. 14, 101:1 – 102:23 (KidKraft executive testifying ██████████████████████████ ██████████████████████████████), 103:13-25 (executive testifying ████████████████████████████████), 108:17-21 (same), 110:7-14 (same). NH had started developing other WPKs, as well as a train table and a dollhouse, but KK's demands on OJC and OJC's forced capitulation to KidKraft's threats, left Naomi Home with no platform to sell, and therefore forced

NH to stop development of these and other new and innovative items. *Id.* This conduct clearly deprived consumers of these items and innovations and, by eliminating those products from the market, lessened competition. DE 144, Ex. 3 at 34, ¶ 77 ("█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████"). The conduct also allowed KidKraft to continue pricing its WPKs and other competing products without fear of price competition from Naomi Home. *Id.* Indeed, KidKraft wielded its monopoly power against others in addition to Plaintiffs, leading to increased prices and reduced product choices through price control, punishment of sellers, and inventory manipulation – all of which actually harmed and had the real potential to harm competition.[6]

This Court should therefore reverse the finding below that KidKraft's action only caused "harm to competitors—not harm to the competition process in general."

---

[6] *See also* DE 235, Ex. 7 (████████████████████████████████████████
██████████████████████); Ex. 8 (KidKraft's internal emails stating

█████████████████████████); Ex. 9 (KidKraft trying to sell the a WPK to one retailer ███████████████████████████); Ex. 10 (KidKraft plans to combat lower pricing by "███████████████████████"); Ex. 1 (KidKraft discussing arrangements with █████████ that could limit competition and keep prices higher).

The District Court also deemed Naomi Home's evidence of competitive harm (as opposed to OJC's) to be "speculative." DE 255 at 6. But Plaintiffs need not quantify the competitive, as with the amount of damages. Plaintiffs need only show "potential" harm to consumer welfare. *Estee Lauder*, 797 F.3d at 1270; *Spanish Broad. Sys.*, 376 F.3d at 1073. Plaintiffs have done that.

Regardless, Plaintiffs' evidence was specific, not speculative. Mr. Weiss testified to the concrete steps Naomi Home had taken to bring its new products to market, before KidKraft demanded Naomi Home cease those efforts. DE 144, Ex. 10, 168:6 - 169:7, 264:25 - 268:13, 270:9-23 (Weiss testifying Naomi Home discontinued making other products that would compete with KidKraft due to its threats to terminate OJC); *see also* DE 144, Ex. 3 at 34, 39, ¶¶ 77, 92 ("█████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████"). After KidKraft terminated OJC, Naomi Home resumed and successfully marketed its new, innovative products. DE 144, Ex. 1 at 7, ¶ 17 ("In December 2016, after KidKraft's termination of OJC, NH decided to attempt to sell its toy kitchen and doll furniture to other retailers."); DE 131,

Defs_Appx Tab A, at 22, ¶ 41 (" ███████████████████████████████

██████████████████████████████████████ "). But consumers and

competition were harmed for the two years the Naomi Home products were delayed,

as customers were deprived of product choice and of price and quality competition

between KidKraft and Naomi Home. *Id*.; DE 144, Ex. 3 at 34, ¶ 77 (" ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ "). KidKraft, or even the District Court, may

have a different interpretation of this evidence, but it is for the jury, not KidKraft or

the District Court, to evaluate credibility and decide whether competition was

harmed. *Strickland*, 692 F.3d at 1154 ("Credibility determinations, the weighing of

evidence, and the drawing of legitimate inferences from the facts are jury functions,

not those of a judge….").

## II.    OJC has presented ample evidence of an actionable *Aspen Skiing* refusal to deal claim

An *Aspen* claim has just three "key elements...: [1] a prior course of voluntary

conduct, [2] sacrifice of short-term profits, and [3] refusal to sell to rivals on the

same terms as other potential buyers. Certainly, no more is required." *Viamedia*, 951

F.3d at 463. **It is undisputed**, and the evidence plainly shows, that the OJC-KidKraft

course of dealing was profitable, voluntary, and long-term. DE 144, Ex. 3 at 35-36,

¶¶ 81-83 (Vanderhart report describing ████████████████████████████████

█████████████████████████████████████); DE 144, Ex. 4 at 15 (KidKraft document showing that OJC was KidKraft's ██ largest customer in 2014); DE 144, Ex. 5 at 5-6 (KidKraft document showing that OJC was KidKraft's ██ largest customer in fiscal year to date 2016). OJC was one of KidKraft's ███ sellers in 2014. *Id.* And there is plenty of evidence that, as a result of the termination, KidKraft lost profits, at least in the short term. *Id.*; DE 144, Ex. 27 at 3 (identifying that "████████████████████████████████████████████████ ██████" in part caused the ████████████████████████████ ███████); DE 144, Ex. 28 at 2 (KidKraft's inability to his its numbers attributed to "█████████████████████████████████████████████████ ██████████████████"); DE 144, Ex. 3 at 37, ¶¶ 85-86 (describing KidKraft internal documents about OJC termination contributing to KidKraft's ███ ███████████████). Additionally, after termination, KidKraft refused to sell to OJC on the same terms as other buyers, or on any terms at all. DE 144, Ex. 1 at 6, ¶¶ 13-14 ("KidKraft's cutoff of OJC … left customers worse off"). Thus, a jury may easily find that Defendants' unilateral termination of this "voluntary (and thus presumably profitable) course of dealing" was based on "a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (citing *Aspen Skiing*, 472 U.S. at 610-11).

Although it is true that *Aspen Skiing* is a "limited exception" to the general rule that "monopolists are not required to do business with rivals," DE 255 at 5-6, the case was reaffirmed in *Trinko* and has been followed many times, including recently by the Seventh Circuit in *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429 (7th Cir. 2020). In *Viamedia*, the Seventh Circuit reversed the dismissal of an anticompetitive refusal to deal claim. After reviewing the Supreme Court's jurisprudence in *Aspen Skiing* and *Trinko*, the Seventh Circuit concluded that a refusal to deal is actionable under § 2 where, as here, there is "a prior course of voluntary conduct, sacrifice of short-term profits, and refusal to sell to rivals on the same terms as other potential buyers." *Id*. at 463; s*ee also Estee Lauder*, 797 F.3d at 1266 (holding that § 2 liability for unilateral termination of a voluntary profitable course of dealing suggests "a willingness to forsake short-term profits to achieve an anticompetitive end," but dismissing complaint because termination was not unilateral).

Pursuant to the *Trinko* limitations, actionable *Aspen Skiing* claims against a monopolist for refusal to deal remain common in the federal courts, in a wide variety of factual contexts. Recent cases in addition to *Viamedia* include, *e.g., Omni Healthcare Inc. v. Health First, Inc.*, 2016 WL 4272164, at *27 (M.D. Fla. Aug. 13, 2016) (denying summary judgment under *Aspen Skiing* on refusal to deal monopolization claim); *Entrata, Inc. v. Yardi Sys., Inc.*, 2019 WL 4597519, at *7

(D. Utah Aug. 14, 2019) (denying summary judgment because, under *Aspen Skiing*, whether a defendant has valid reasons for refusing to deal "is a question for the jury to decide"); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 311 F. Supp. 3d 468, 484 (D.R.I. 2018) (under *Aspen Skiing* and *Trinko*, plaintiff's refusal-to-deal claims for unlawful monopolization "clear the summary-judgment bar"); *Altitude Sports & Ent., LLC v. Comcast Corp.*, 2020 WL 8255520, at *11 (D. Colo. Nov. 25, 2020) (denying motion to dismiss *Aspen Skiing* refusal to deal claim); *Iris Wireless LLC v. Syniverse Techs.*, 49 F. Supp. 3d 1022, 1029 (M.D. Fla. 2014) (upholding refusal to deal claim under *Aspen Skiing*); *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1082 (C.D. Cal. 2017) (refusing dismissal because "this case plausibly fits within the *Aspen Skiing* exception"); *In re Thalomid & Revlimid Antitrust Litig.*, 2015 WL 9589217, at *15 (D.N.J. Oct. 29, 2015) (same).[7] The District Court did not mention *Viamedia* or any of these other cases.

Instead, per the District Court, for "the *Aspen* exception to apply, 'the monopolist's conduct must be irrational but for its anticompetitive effect.'" DE 255 at 6 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013)).

---

[7] *See also Helicopter Transp. Servs., Inc. v. Erickson Air–Crane Inc.*, 2008 WL 151833, at *9 (D. Or. Jan. 14, 2008) (denying summary judgment on *Aspen Skiing* refusal to deal claim); *Pepsico, Inc. v. Coca-Cola Co.*, 1998 WL 547088, at *17–18 (S.D.N.Y. Aug. 27, 1998) (denying motion to dismiss).

"Terminating the joint venture in [*Aspen Skiing*] was irrational but for its anti-competitive goal of phasing out the fourth ski lodge's business eventually. This is hardly the case here." *Id*. With respect, this is **exactly** the case here. Based on the record evidence, the jury can conclude that KidKraft's termination of OJC was irrational but for KidKraft's goal of preventing competition from Naomi Home. Internal KidKraft emails show that it was unable to meet its 2017 targets, due in substantial part to the loss of revenue from the termination of OJC. DE 144, Ex. 27 at 3 (identifying that "█████████████████████████████████████ █████████████████" in part caused the "█████████████████████████ █████████████"); DE 144, Ex. 28 at 2 (KidKraft's inability to his its numbers attributed to █████████████████████████████████████ ████████████████████████████"); DE 144, Ex. 3 at 37, ¶¶ 85-86 (describing KidKraft internal documents about OJC termination contributing to KidKraft's ████████████). No business would rationally want that loss revenue.

Moreover, while KidKraft posits *ex-post-facto* reasons why it may have wanted to terminate OJC, there is enough evidence for the jury to decide those reasons are false. See DE 255, at 8. If the jury finds that anticompetitive motives was **the** reason for termination, then the **only** reason OJC was terminated was for KidKraft to wipe out competition – leaving no other reason – rational or not.

And importantly, the "irrational" test has not been adopted by this Court or even by the Tenth Circuit, in which it originated. In *Novell*, it was dicta; the holding was that the plaintiff had no evidence that the defendant was sacrificing short-term profits, and "all the evidence suggests that Microsoft's decision came about as a result of a desire to maximize the company's immediate and overall profits." 731 F.3d at 1076.[8] The Seventh Circuit in *Viamedia* upheld an *Aspen Skiing* claim specifically without deciding whether a showing of "irrationality" is required. *Viamedia*, 951 F.3d at 463 ("Even if an allegation that a defendant's conduct was irrational but for its anticompetitive effect were necessary, Viamedia has plausibly alleged just that"). And the authors of the treatise that the Tenth Circuit quoted for the "irrational" language indicate that, as they use the term, "irrational" means "unprofitable." A&H ¶ 651b3 (monopolizing conduct is not limited to conduct that is "irrational" in the sense that the "only explanation that makes it seem profitable is destruction or discipline of rivals," and a "no economic sense" test "can lead to erroneous results unless complicating qualifications are added").

Furthermore, post-*Novell* decisions within the Tenth Circuit have upheld *Aspen*-based refusal to deal claims. "*Aspen* makes clear" that whether a defendant

---

[8] *Id.* ("The difficulty is that Novell has presented no evidence from which a reasonable jury could infer . . . a willingness to sacrifice short-term profits, let alone in a manner that was irrational but for its tendency to harm competition." *Novell*, 731 F.3d at 1076.

has valid reasons for refusing to deal "is a question for the jury to decide—not the court—so long as there is **some** evidence in the record that could support a finding that [defendant's] proffered business reasons for its refusal to deal with [plaintiff] were invalid." *Entrata*, *supra*, 2019 WL 4597519, at *7 (quoting *Novell* but denying summary judgment) (emphasis added); *see also Altitude Sports*, *supra*, 2020 WL 8255520, at *11 (denying motion to dismiss because plaintiff's allegation that the terminated agreement had a "net positive outcome" for defendant "sufficiently allege[d] irrational conduct but for its tendency to harm competition").

Plaintiffs submit that the "irrational" standard is too narrow and should not be adopted by this Court. But even if it is accepted, the summary judgment should be reversed because it is for the jury to hear the evidence and decide whether KidKraft's decision to terminate a long term, voluntary, and profitable relationship and cause a loss of short-term profits can rationally be based on something other than an intent to maintain KidKraft's monopoly on WPKs.

## III. <u>The "Legitimate Business Reasons" defense is for the jury</u>

If the Court agrees that there are genuine issues of material fact as to harm to competition and the *Aspen Skiing* refusal to deal, this case should be remanded for trial on the merits. At trial, Defendants will be free to present their "legitimate business reasons" defense.

Defendants asked for summary judgment on the grounds that there were legitimate reasons for OJC's termination. The District Court stated that it "not need to decide this issue" in light of its ruling that Plaintiffs had failed to show harm to competition. DE 255 at 7-8. Judge Cooke said it was "questionable whether Defendants have met their burden of establishing legitimate business justifications" and that "the record contains enough evidence from which a jury could conclude that at least one of the reasons provided are pretextual." *Id.* at 7-8 & n.1.

Although the District Court did not rule on the legitimate justifications issue, it did erroneously comment that "Plaintiffs have not meaningfully responded to Defendants' assertions of legitimate business purposes. Plaintiffs' main response to these assertions is that OJC was never informed of these reasons, even during negotiations to reinstate the agreement, and that KidKraft's failure to inform OJC of these reasons is evidence that they are pretextual." DE 255 at 8, n.1. As discussed below, the court's description of Plaintiffs' evidence and arguments is incorrect, but even if it was correct, that argument is sufficient to create a factual dispute. A jury may infer pretext from *post hoc* reasons for termination first proffered after the commencement of litigation. *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1995) (pretext may be demonstrated through "shifting explanations"). *See*, *e.g.*, *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) (reversing summary judgment because "Post-hoc justifications for

termination constitute evidence of pretext"); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 576 (4th Cir. 2015) (reversing summary judgment because plaintiff may prove pretext "by demonstrating that the asserted justifications, even if true, are *post hoc* rationalizations invented for purposes of litigation"); *Weiss v. JPMorgan Chase & Co*., 332 F. App'x 659, 663 (2d Cir. 2009) ("a jury could infer pretext from JPMorgan's failures to present these reasons to Weiss initially").

In truth, however, that was not the only reason Plaintiffs offered. Plaintiffs devoted over two pages in their summary judgment opposition to refuting Defendants' argument that the termination was justified as a matter of law. DE 142 at 13-15 (citing DE 144, Ex. 1, Ex. A; DE 144, Ex. 11, Ex. 12, Ex. 3 at 35-37, 39, ¶¶ 80, 83, 84, 94, Exs. C, F; Ex. 10, 88:1-6, 280:6 – 281:5, 285:10 – 288:10; Ex. 1, ¶ 15; Ex. 15; Ex. 16; Ex. 17). Plaintiffs also supplemented their opposition with additional evidence, which included internal KidKraft documents and testimony from KidKraft's Director of North American Sales. DE 235 at 6, § E (citing DE 235, Exs. 22, 23, 121:2-4).

Defendants' primary contention was that OJC was terminated for "knocking off" KidKraft's WPK, and Plaintiffs showed this explanation was pretextual because the Naomi Home WPKs are completely different, as shown by the comparison photo, *supra*, and other evidence. *Id*.; DE 143 at 3; DE 144, Ex. 1 at 3-6, 9-14 ¶¶ 4-12 and Ex. A; DE 144, Ex. 3 at 38-39, ¶¶ 91-93 (describing considerable expense

49

and time going into independent development of Naomi Home WPK). Defendants also asserted that OJC was terminated because its sales of KidKraft products were "plummeting," but Plaintiffs showed evidence that 2015 had been a record year for OJC's sales of KidKraft products, exceeding KidKraft's internal budget by over ████. DE 143 at 14-15; DE 144, Ex. 3 at 35, 62, ¶ 80 & Ex. C ("████████████████████████████████████████████████████████ ████████████████████"). Plaintiffs also showed that for 2016, the year KidKraft terminated the relationship, the lower results were due to KidKraft's own lack of inventory and the perfectly timed termination occurring just before the Thanksgiving and Christmas holidays, which account for a large portion of sales. *Id.*; DE 144, Ex. 10, 88:1-25 (Weiss testifying KidKraft not having kitchens in stock between Thanksgiving and Christmas "cost[] us significant amount of lost opportunity sales"). Also, KidKraft did not terminate other retailers who sold far less of KidKraft's products than sold by OJC but did not sell NH's competing WPKs. DE 144, Ex. 3 at 37, ¶¶ 85-87 (opining that "█████████████████████████████ ███████████████████████████").

As shown above, OJC presented much evidence that Defendants' assertion of "legitimate business purposes" were factually deficient and pretextual. Given this factual dispute over KidKraft's intent/motive, the jury must determine KidKraft's actual motivation. *See Viamedia*, 951 F.3d at 457 (courts treat justifications for

anticompetitive conduct "as a factual issue properly resolved by the jury"); *see also Eastman Kodak v. Image*, 504 U.S. 451, 483 (1992) ("Factual questions exist, however, about the validity and sufficiency of each claimed justification, making summary judgment inappropriate"); *Poller v. CBS*, 386 U.S. 464, 491 (1962) (summary judgment inappropriate for antitrust cases involving "motive and intent"); *Feminist Women's Health Ctr., Inc. v. Mohammad*, 586 F.2d 530, 547 (5th Cir. 1978) ("triable fact issues remain as to the genuineness of the defendants' justification"); *Omni Healthcare*, *supra*, 2016 WL 4272164, at *27 (denying summary judgment because "multiple pieces of evidence" suggested that the "purported business reasons are pretextual").

Accordingly, this Court should hold that the jury must decide whether KidKraft terminated OJC for anticompetitive reasons or for the purported "legitimate" reasons.

## IV.   **The Tortious Interference Claim Should Be Reinstated**

If this Court agrees, as it should, that any or all of Plaintiffs' antitrust claims should be reinstated, the summary judgment on the tortious interference claim should also be reversed. As Plaintiffs have acknowledged that their "state law claim relies on their ability to succeed on their antitrust claim," the District Court granted summary judgment on this claim in light of its decision on the antitrust claims. DE 255 at 8.

The court added, however, that "an element of a tortious interference claim under Florida law is the absence of any justification, which Plaintiffs have not alleged or shown here." *Id.* at 8-9 (citing *Johnson Enters, of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998). This reasoning was erroneous.

Justification is an affirmative defense that the plaintiff need not plead and the defendant has the burden of proving. *Thompson v. Allstate Ins. Co.*, 476 F.2d 746, 748 (5th Cir. 1973); *T.V. Azteca S.A. de C.V. v. Telemundo Commc'ns Grp., Inc.*, 2007 WL 9701166, at *6 (S.D. Fla. Feb. 21, 2007) (same); *Law Offs. of David J. Stern, P.A. v. SCOR Reinsurance Corp.*, 354 F. Supp. 2d 1338, 1346 (S.D. Fla. 2005) (defendant has "burden of avoiding liability by showing that its conduct was privileged or justified"). Nonetheless, Plaintiffs did in fact plead that "[t]here was no legal justification for MidOcean's tortious actions." DE 1, ¶¶ 80, 75, 31-36.) Therefore, the District Court's finding that Plaintiffs did not allege an absence of justification is plainly wrong. Moreover, Plaintiffs submitted evidence that MidOcean's interference was done in furtherance of anticompetitive and illegal ends, *i.e.*, to increase KidKraft's monopoly power in the WPK market. DE 131, Ex. 19 at 2; DE 144, Ex. 10, 280:6 - 281:5, 281:10 – 288; DE 235, Ex. 19, at 025841, 025863,025865); *see also* DE 235, Ex. 21 (KKI_0181501); Ex. 3 at 1, Ex. 5 at 22976.

In an effort to justify its interference, MidOcean argued that it has a "significant financial interest" in KidKraft, thus was not a "stranger" to the OJC/KidKraft relationship, and therefore could not be liable for tortious interference. DE 130 at 20. However, Florida law is settled that "significant financial interest" and other purported justifications or privileges do not excuse the interference where, as here, the defendant uses illegal or improper means, or does not act in good faith. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) (the privilege of justification applies only if "the means employed are not improper"); *Plain Bay Sales, LLC v. Gallaher*, 2020 WL 5750499, at *2 (S.D. Fla. Sept. 25, 2020) (illegal or improper methods void privilege); *Burger King Corp. v. Ashland Equities, Inc.*, 161 F. Supp.2d 1331, 1336 (S.D. Fla. 2001) (financial interest privilege "is limited and does not afford an absolute bar to liability," it only applies "where the interference was not done for some improper purpose," and "is qualified by the obligation to proceed in good faith").

Thus, the issue of MidOcean's bad faith and improper intent is for the jury. *T.V. Azteca*, *supra* (justification "is a factual question to be determined by the jury"). As shown above, Mid-Ocean's conduct was improper and illegal under federal antitrust law, and it was done in bad faith. See RESTATEMENT (SECOND) OF TORTS § 769 cmt. d (1979) (no justification if defendant uses "unlawful means such as an illegal boycott or conduct in restraint of competition or productive of an illegal

monopoly"). The summary judgment on tortious interference should therefore be reversed.

## CONCLUSION

For the reasons shown above, the summary judgment for Defendants should be reversed, and this case should be remanded for a trial on the merits. If the Court agrees there is a genuine factual issue regarding harm to competition, all of Plaintiffs' claims should be reinstated for this reason alone, except for OJC's *Aspen Skiing* refusal to deal claim and the tortious interference claim. As OJC has presented sufficient evidence to create a jury issue on the *Aspen Skiing* claim, this claim should be remanded for trial as well. Finally, the holding on tortious interference should also be reversed and remanded, as there are fact issues on whether Mid-Ocean's interference was justified or privileged.

Plaintiffs have ample evidence that Defendants maintained or at least attempted to maintain KidKraft's monopoly, entered into an agreement that unreasonably restrains trade, and tortiously interfered with Plaintiffs' businesses. Defendants terminated a voluntary, profitable relationship and sacrificed short-term profits for the sole purpose of eliminating competition and maintaining a monopoly, and they attempted to exclude a competitor from the market. The antitrust laws are designed to prevent this precise conduct, so Plaintiffs should be given their rightful day in court.

Dated: July 14, 2021                Respectfully submitted,

By: /s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman
Constantine Economides
ROCHE FREEDMAN LLP
P.O. Box 654139
Miami, Florida 33265

Shlomo Y. Hecht
SHLOMO Y. HECHT, PA
3076 N. Commerce Pkwy
Pembroke Pines, FL 33025

*Attorneys for Plaintiffs-Appellants*

## Certificate of Compliance

The undersigned certifies that this document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,999 words, according to Microsoft Word, the word-processing system used to prepare this document. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Dated: July 14, 2021            By: /s/ Velvel (Devin) Freedman
                                Velvel (Devin) Freedman




## Certificate of Service

I hereby certify that on July 14, 2021, a true and correct copy of the foregoing *Plaintiffs-Appellants' Opening Brief* has been sent via CM/ECF, to all counsel of record.

Dated: July 14, 2021            By: /s/ Velvel (Devin) Freedman
                                Velvel (Devin) Freedman